# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4061 | **DATE** | 3/11/2003 |
| **CASE TITLE** | | Firstar vs. Faul | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at_____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment is granted in part and denied in part. Judgment is entered in favor of Defendants with respect to Count I and Count V. Judgment is entered in favor of Lawrence J. Faul with respect to Count IV and Count VI. Defendants' motion is denied with respect to Faul Chevrolet, Inc. in Count IV and Count VI.

*Amy J. St. E*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | **Document Number** |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 12 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 89 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TH ✓ | courtroom deputy's initials | CLERK U.S. DISTRICT COURT | date mailed notice | | |
| | | 03 MAR 11 PM 5:06 | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

DOCKETED

MAR 1 2 2003

MAR 12 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

FIRSTAR BANK, N.A.,

    Plaintiff,

v.

FAUL CHEVROLET, INC.,
THE FAUL GROUP, INC., and
LAWRENCE J. FAUL,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 00 C 4061

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

Firstar Bank, N.A. ("Firstar") filed a six-count complaint against Faul Chevrolet, Inc. ("the Dealership"), The Faul Group, Inc., and Lawrence J. Faul (collectively, "Defendants"). On February 24, 2003, the Court entered partial summary judgment in favor of Firstar and against the Dealership with respect to three of the six counts. *See Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 2003 WL 548365 (N.D. Ill. Feb. 24, 2003). Before the Court now is Defendants' motion for summary judgment on Count I (piercing the corporate veil), Count IV (fraud), Count V (fraudulent conveyance), and Count VI (conversion). For the reasons stated herein, Defendants' motion is granted in part, and denied in part.

## LEGAL STANDARD

Summary judgment is proper when the evidence presented to the Court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is

89

such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica Indiana*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party that bears the burden of proof on a particular issue, however, may not rest on its pleadings but must affirmatively demonstrate that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. at 2553. A mere scintilla of evidence in support of the non-movant's position is insufficient. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

In deciding whether summary judgment is appropriate, the Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). Further, the Court accepts the non-moving party's version of any disputed facts so long as it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## FACTUAL BACKGROUND

### I.     Firstar's Relationship With The Dealership

On March 3, 1999, the Dealership and Firstar executed a dealer agreement. (R. 60-1, Defs.' Statement of Material Facts ¶49.) Under the agreement, Firstar had the right to purchase motor vehicle retail installment sale contracts and lease contracts that the Dealership had entered into with its customers. (*Id.* ¶50.) In order to start the process, the Dealership would fax a customer's credit

application to Firstar. (*Id.* ¶54.) If and when Firstar agreed to purchase the contract, the Dealership would prepare and deposit a Firstar draft note for the purchase price plus any commission it earned at the time.[1] (*Id.* Ex. W at 49.)

Once the Dealership delivered the vehicle to the customer, it provided Firstar with the final documents. (*Id.*) After receiving those documents, Firstar created a loan file. (*Id.*) All told, Firstar purchased approximately $7 million worth of sales contracts and leases from the Dealership. (*Id.* ¶52.)

## II.    Drafting Irregularities

The Dealership prepared drafts for Firstar's purchases of both sales and lease contracts. Very few drafting problems normally occur with respect to sales contracts. A redrafting of the note related to a sales contract is generally only necessary where the wrong type of draft note was used or where there was a problem with the titling of the car. (R. 60-1, Defs.' Statement of Material Facts ¶160.) Errors with drafts relating to lease agreements, however, are more common and occur approximately thirty to forty percent of the time. (*Id.* ¶161.) Lease agreement errors do not always require a redraft. (*Id.*) The primary reason for redrafting is that there was a mistake in the amount listed on the initial draft. (*Id.* ¶162.) It is unusual to need to write additional drafts or to redraft unless a purchaser like Firstar gives instructions to do so. (*Id.* ¶165.) Firstar's procedure was to always notify the Dealership in writing if they needed to redraft or to write additional drafts. (*Id.* ¶166.) During 1999 and 2000, several irregularities occurred with respect to the Dealership's writing and depositing of Firstar drafts, as detailed below.

---

[1]  To facilitate the transactions, Firstar provided the Dealership with some of its blank draft notes in blocks of fifty or more. (R. 60, Defs.' Statement of Material Facts ¶¶51, 53.)

## A.    Kieffer Transaction

On March 24, 1999, Richard Kieffer agreed to lease a motor vehicle from the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶72.) Initially, Firstar declined to purchase the lease. (*Id.*) Notwithstanding Firstar's decision, the Dealership prepared and deposited a Firstar draft for $29,596.84 two days later. (*Id.*) Firstar later agreed to purchase the lease. (*Id.*) The Dealership then prepared and deposited another Firstar draft for $28,421.84. (*Id.*) This second draft paid for the purchase of the lease. (*Id.*) The Dealership owes Firstar for the initial draft. (*Id.*)

## B.    Caballero Transaction

On July 31, 1999, Marcos Caballero entered into a contract to purchase a motor vehicle with the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶77.) Firstar approved the purchase of the contract on August 11, 1999. (*Id.*) Two days later, the Dealership prepared and deposited a Firstar draft for $23,782.38. (*Id.*) On September 9, 1999, the Dealership prepared and deposited another Firstar draft for $21,892.09. (*Id.*) The second draft paid for the contract entirely. (*Id.*) The Dealership owes Firstar for the first draft. (*Id.*)

## C.    Amato Transaction

On September 3, 1999, Anthony Amato agreed to lease a motor vehicle from the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶69.) Firstar initially declined to purchase the lease. (*Id.*) The Dealership, nonetheless, prepared and deposited a Firstar draft for $50,203.80 on that day. (*Id.*) Later, Firstar agreed to purchase the lease. (*Id.*) On October 14, 1999, the Dealership prepared another Firstar draft for the same amount. (*Id.*) This second draft paid for the purchase of the lease. (*Id.*) Firstar returned the previous draft. (*Id.*)

### D.    Iacullo Transaction

On September 14, 1999, Maureen Iacullo signed an agreement to lease a motor vehicle from the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶75.) Although the Dealership had not executed that customer contract, it forwarded the documentation to Firstar. (*Id.*) Firstar approved the purchase of the lease the next day. (*Id.*) On September 16, the Dealership prepared and deposited a Firstar draft for $26,221.90 for the lease. (*Id.*)

On September 20, 1999, the Dealership prepared another lease with different terms for Iacullo. (*Id.*) It then prepared and deposited another Firstar draft for $25,232.23. (*Id.*) This time, Iacullo did not execute the lease. (*Id.*) Firstar eventually returned the initial draft, but the Dealership still owes for the second draft. (*Id.*)

### E.    Carlson Transaction

On September 18, 1999, Donna Carlson agreed to lease a motor vehicle from the Dealership. Firstar approved of the purchase of the lease. (R. 60-1, Defs.' Statement of Material Facts ¶71.) Two days later, the Dealership prepared and deposited a Firstar draft for $30,305.71. (*Id.*) A week later, the Dealership prepared and deposited another draft for $30,618.05. (*Id.*) This second draft entirely paid for the lease. (*Id.*) The previous draft was returned to Firstar and charged to the Dealership's account on the same day that the Dealership deposited the second draft. (*Id.*)

### F.    Ciffone Transaction

On September 23, 1999, Gerald Ciffone and Therese Ciffone agreed to lease a motor vehicle from the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶80.) Two days before, Firstar had approved of the purchase of the lease and the Dealership prepared and deposited a Firstar draft for $25,316.71. (*Id.*) On September 23 and September 27, the Dealership prepared and deposited

two Firstar drafts for $22,979.59 each. (*Id.*) Firstar returned the September 27 draft. (*Id.*) The September 23 draft paid for the purchase of the lease entirely. (*Id.*) The parties dispute whether the Dealership owes Firstar for the September 21 draft. (*Id.*)

### G. Hatz Transaction

On November 8, 1999, Gregory Hatz agreed to lease a motor vehicle from the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶78.) Firstar had approved of the lease and the Dealership had prepared and deposited a Firstar draft for $21,779.63 three days earlier. (*Id.*) On the day Hatz executed the lease, the Dealership prepared and deposited another draft for the same figure. (*Id.*) The first draft paid for the purchase of the lease entirely. (*Id.*) The Dealership owes Firstar for the second draft. (*Id.*)

### H. Shabayev Transaction

On November 8, 1999, Alex Shabayev agreed to lease a motor vehicle from the Dealership. (R. 60-1, Defs.' Statement of Material Facts ¶76.) Even before the lease was signed, the Dealership prepared and deposited three drafts. (*Id.*) Firstar, which initially declined to purchase the lease before later agreeing to its purchase, returned two of the drafts on November 19, 1999. (*Id.*) The Dealership prepared and deposited a fourth draft on November 8, 1999 for $25,386.76, which entirely paid for the lease. (*Id.*) The Dealership still owes Firstar $25,848.22 for the third draft. (*Id.*)

### I. Painter Transaction

On November 20, 1999, Scott Painter agreed to lease a motor vehicle from the Dealership. Firstar approved of the purchase of the lease. (R. 60-1, Defs.' Statement of Material Facts ¶74.) The Dealership prepared and deposited three drafts, each for $27,346.40. (*Id.*) One draft alone would have paid for the purchase of the lease. (*Id.*) The Dealership still owes Firstar for two of the drafts.

(*Id.*)

### J. Navarro Transaction

On November 26, 1999, Michelle Navarro agreed to purchase a motor vehicle from the Dealership. (R. 64-1, Pl.'s Statement of Add'l Material Facts ¶178.) The amount to be financed was $18,369.87. (*Id.*) The Dealership submitted the Navarro deal to at least six financing institutions. (*Id.* ¶179.) Only Mercantile Bank agreed to finance the deal. (*Id.*)

Firstar declined the deal on November 15, 1999, yet the Dealership wrote a Firstar draft for $18,369.87 on November 26, 1999. (*Id.*) The Dealership still owes Firstar for the improper draft. (*Id.*) Great Bank declined the deal on November 19, 1999, but the Dealership had written a draft on Great Bank's account on November 18, 1999 for $19,349.87. (*Id.*) The dealership wrote a draft on Key Bank USA's account for $19,439.00 on November 24, 1999. (*Id.*) The Mercantile Bank approved the deal on November 15, 1999, but the Dealership wrote three drafts on Mercantile Bank's account for amounts between $18,369.87 and $21,530.41 over the next two weeks. (*Id.*)

### K. Robinson Transaction

On November 26, 1999, the Dealership entered into a sales contract with Judy Robinson and Michael Robinson. (R. 60-1, Defs.' Statement of Material Facts ¶70.) That day, the Dealership prepared and deposited a Firstar draft for $42,431.96. (*Id.*) Three days later, Firstar approved of the purchase of the contract. (*Id.*) The Dealership then prepared and deposited another Firstar draft for $38,282.23. (*Id.*) This second draft paid for the contract entirely. (*Id.*) The Dealership owes Firstar for the first draft. (*Id.*)

### L. Six Sigma Transaction

On December 22, 1999, Six Sigma Marketing entered into a contract with the Dealership.

(R. 60-1, Defs.' Statement of Material Facts ¶73.)  Firstar decided to purchase the contract.  (*Id.*)

The Dealership prepared and deposited a Firstar draft for $27,814.00.  (*Id.*)  Firstar directed the

Dealership to issue a new draft with a revised figure.  (*Id.*)  The Dealership, without returning the

previous draft, prepared and deposited another draft for $26,820.50.  (*Id.*)  This second draft paid for

the contract entirely.  The Dealership still owes Firstar for the first draft.  (*Id.*)

## III.  Defendants' Corporate Relationship

The Dealership was incorporated in 1960 as a retailer of new and used motor vehicles and

accessories. (R. 60-1, Defs.' Statement of Material Facts ¶¶1-3.)  The Faul Group was incorporated

in 1977 as a holding company.  (*Id.* ¶¶6-8.)  It is the current shareholder of all outstanding shares of

the Dealership.  (*Id.* ¶5.)  Lawrence J. Faul owns all of the Faul Group's preferred shares, which

account for approximately seventy percent of the Faul Group's total stock. (*Id.* ¶10.)  The Lawrence

J. Faul Children's Trust owns all of the common stock of the Faul Group.  (*Id.*)  Only ownership of

preferred shares instills voting rights.  (*Id.* ¶11.)

## IV.  Faul's Involvement With The Dealership And The Faul Group

### A.  Faul's Benefits

Since 1997, Faul has been the only director and officer of the Dealership. (R. 64-1, Pl.'s

Add'l Material Facts ¶15.)  Faul was entitled to a salary of $120,000 per year from 1999 until May

31, 2000, although he did not always receive it.  (R. 60-1, Defs.' Statement of Material Facts ¶¶20-

21.) The Dealership did not pay Faul any bonuses.  (*Id.* ¶20.)  The Dealership also did not issue him

any shareholder dividends.  (*Id.* ¶20.)  The Dealership paid Faul other benefits, including health and

dental insurance, a car to drive, and a place to park his boat.[2]  (R. 64-1, Pl.'s Add'l Facts ¶118-119.)

---

[2]  On at least two occasions, Faul used the boat for business purposes.  (*Id.* ¶120.)

Additionally, the Dealership provided a cellular phone to Faul's wife. (*Id.* ¶121.) Faul also held the beneficial interest in a land trust where the Dealership was located. (R. 72-1, Defs.' Resp. to Add'l Facts ¶96.)

### B.     Faul's Duties

Before January 20, 2000, Faul worked in an office on the Dealership's second floor. (R. 60-1, Defs.' Statement of Material Facts ¶¶18; R. 62-1, Pl.'s Statement of Add'l Material Facts ¶101.) While there, Faul spent about half of his time managing the Dealership and the other half working on other matters, including the administration of his other businesses' affairs. (R. 60-1, Defs.' Statement of Material Facts ¶16; R. 62-1, Pl.'s Statement of Add'l Material Facts ¶101.)

As part of Faul's work on Dealership matters, he attended: (1) weekly meetings with the general manager, used car manager, finance manager, service manager, and parts manager, (2) bimonthly meetings regarding accounts receivable and accounts payable, (3) meetings concerning vehicle receivables, (4) sales meetings, (5) service meetings, and (6) weekly meetings with all department heads. (R. 62-1, Pl.'s Statement of Add'l Material Facts ¶104.) Additionally, approximately twice a week Faul and the other managers conducted "pending meetings" to discuss the status of automobiles that had been sold or leased, but for which the Dealership had not been paid. (*Id.* ¶105.) Bounced checks, returned drafts, and due payments were discussed at every pending meeting. (*Id.*) Further, Faul met with the Dealership's senior staff to review the previous week's sales. (*Id.* ¶106.) Faul would also informally talk to the general manager about the Dealership's sales, particular customer and service problems, and specific leases or sales for which the Dealership was having trouble finding a bank to finance the deal. (*Id.* ¶107.)

### C.    Faul's Supervision of the Dealership

In addition to attending these meetings, Faul kept a tab on the Dealership's business by reviewing weekly reports regarding various aspects of the Dealership. (R. 62-1, Pl.'s Statement of Add'l Facts ¶108.) He also monitored the financing department weekly by reviewing a spreadsheet that informed him of the status of all outstanding sales contracts and leasing deals. (*Id.* ¶109.) Additionally, he supervised the accounting department by checking with accounting managers on the status of various aspects of the business and reviewing accounting reports on daily sales and receivables. (*Id.* ¶110.) Further, Faul monitored the Dealership's cash flow. (*Id.* ¶111.)

Faul was one of two people that handled the Dealership's bank and loan structuring. (R. 72-1, Defs' Resp. to Add'l Facts ¶112.) He and others also managed inventory controls and made decisions regarding inventory levels. (*Id.* ¶113.) Faul had access to the deal files or deal jackets that contained all of the relevant documents for each sales contract or lease. (R. 62-1, Pl.'s Statement of Add'l Facts ¶115.) Faul was actively involved in the Dealership's business in the last three months of 1999. (*Id.* ¶117.)

### D.    Affiliate Overlap

At least two of the Dealership's employees engaged in some work for the Dealership's affiliates. (R. 72-1, Defs.' Resp. to Add'l Material Facts ¶¶122-24.) The Dealership's general manager had authority to sign payroll checks for affiliates. (*Id.* ¶122.) Additionally, one employee worked for the Faul Collision Center from time to time. (*Id.* ¶124.)

## VI.    Faul And The Faul Group Provide The Dealership With Loans

Faul personally loaned the Dealership $500,000 in March 1999. (R. 60-1, Defs.' Statement of Material Facts ¶29.) Later in the year, he loaned an additional $700,000 to the Dealership. (*Id.*

¶31.) The Dealership never paid back any portion of these loans. (*Id.* ¶¶30-33.) The Faul Group also loaned the Dealership between $1.25 and 1.5 million in the 1990s. (R. 62-1, Pl.'s Statement of Add'l Material Facts ¶125.)

## VII. The Dealership's Business Troubles

The Dealership was not a profitable business. (R. 60-1, Defs.' Statement of Material Facts ¶34.) It did not make a profit in any year of existence after 1996. (R. 62-1, Pl.'s Statement of Add'l Facts ¶130.) There were many reasons why the Dealership had these difficulties. First, it did not have a large enough sales volume to cover its overhead. (R. 60-1, Defs.' Statement of Material Facts ¶35.) Additionally, the Dealership suffered because of nearby competition in the used car market and generally slow sales with Chevrolet cars. (*Id.*) Finally, there was a large drop-off of Chevrolet sales in the Dealership's region in 1999. (R. 62-1, Pl.'s Statement of Add'l Facts ¶131.) As a result, the Dealership's general manager was frequently told that a certain number of sales had to be made on a given day to cover checks that the Dealership had written to its vendors that were going to clear that day. (*Id.* ¶129.) The Dealership attempted to lower expenses by reevaluating staff, considering different salary strategies, and changing its advertising budget. (*Id.* ¶132.) For various reasons, however, none of these changes solved the Dealership's problems. (*Id.*)

## VIII. Zero Balance Account

To create positive cash flow, the Dealership made use of a zero balance checking account. (R. 72-1, Defs.' Resp. to Add'l Material Facts ¶139.) A zero balance checking account is really a group of accounts. (R.62-1, Pl.'s Statement of Add'l Material Facts ¶140.) At the end of each day, all accounts except the master one revert to a zero balance. (*Id.*) The net negative or positive balances are transferred to the master account. (R. 72-1, Defs.' Resp. to Add'l Material Facts ¶140.)

One of the purposes of a zero balance account is to assist with cash flow, because a company may draft checks in excess of the amount available on its book balance by using cash from a second company in the master account. (*Id.* ¶141; R. 62-1, Pl.'s Statement of Add'l Material Facts ¶141.) That does not mean that the second company is actually transferring money to the first, because each company keeps its own book balance with the master account. (*Id.*)

The Dealership, the Faul Group, and Faul Collision Center all participated in the zero balance checking account. (*Id.* ¶142.) From June 7, 1999 to January 12, 2000, the Dealership wrote 128 zero balance account float checks to the Faul Group. (*See* R. 60-1, Defs.' Statement of Material Facts, Ex. 37.) Some of these checks could give the dealership a one-day float on transferred funds.

## IX.    The Dealership Falls Out Of Trust

Chrysler Financial Corporation was the Dealership's floor plan lender. (R. 60, Defs.' Statement of Material Facts ¶36.) In that capacity, Chrysler provided loans to the Dealership for motor vehicles in its inventory. When the Dealership sold a motor vehicle, it was obligated to submit payment to Chrysler within a short period of time. Faul personally guaranteed the Chrysler loans. (R. 62-1, Pl.'s Statement of Add'l Material Facts ¶97.)

Chrysler, which was a secured creditor, learned that the Dealership was "out of trust" in January 2000. (*Id.* ¶133.) This meant that the Dealership had sold vehicles subject to Chrysler's loan, but had not submitted payment as required by the floor plan agreement. (*Id.*) The Dealership owed Chrysler between $800,000 and $1.4 million. (*Id.* ¶134.) In February 2000, Chrysler began demanding payments for the outstanding balance. (R. 60-1, Defs.' Statement of Material Facts ¶37.) From February through May 2000, Chrysler stopped funding the Dealership's inventory and demanded that Faul pay for the Dealership's debts. (R. 62-1, Pl.'s Statement of Add'l Material Facts

¶¶135, 138.)

On February 23, 2000, the Dealership entered into a Forbearance Agreement with Chrysler that gave it until March 27, 2000 to repay Chrysler for the out of trust motor vehicles. (R. 60-1, Defs.' Statement of Material Facts ¶41.) The Forbearance Agreement stated that the amount of debt owed to Chrysler was in excess of $8.8 million. (*Id.* ¶42.) It identified each default and confirmed Chrysler's position as a secured lender with a security interest in all of the Dealership's assets. (*Id.*)

Not counting Firstar and Chrysler, the Dealership owed approximately $3,000,000 to at least thirty creditors on May 31, 2000. (R. 62-1, Pl.'s Statement of Add'l Material Facts ¶136.) Near the end of the Dealership's operational life, it owed rental payments to Faul. (*Id.* ¶137.)

## X. Faul's Behavior

Two of the Dealership's employees besides Faul had authorization to sign drafts. (R. 62-1, Pl.'s Statement of Add'l Material Facts ¶¶155-56.) Faul did not execute any of the improper drafts. On some occasions where the checking account funds were low, one employee in particular had to sign checks or drafts because, "mysteriously [Faul] would disappear for the day and there was nobody left to sign" but that employee. (*Id.* ¶158.)

In the winter of 1999 and Spring of 2000, one Firstar employee had a difficult time reaching Faul to discuss the improper draft issue. (R. 62-1, Pl.'s Statement of Add'l Material Facts ¶184.) On one of those days, the Firstar employee went to the Dealership, where he was told that Faul was not there. (*Id.*) When that employee telephoned a few minutes later, Faul answered his line. (*Id.*)

## XI. Faul Sells The Dealership

In January 2000, Faul decided to try to sell the Dealership to avoid personal and corporate bankruptcy. (R. 62-1, Pl.'s Statement of Add'l Material Facts, Ex. 5 at 47.) On March 24, 2000, the

Dealership entered into an agreement with Grossinger Chevrolet, Inc. for the sale of most of the Dealership's assets. (R. 60-1, Defs.' Statement of Material Facts ¶43.) The Dealership did not notify Firstar of the asset sale until after at least a portion of it was consummated. (R. 62-1, Pl.'s Statement of Add'l Facts ¶150.) On March 31, 2000, Chrysler sent the Dealership a notice that it would not agree to reserve any funds for any creditor until Chrysler was paid in full. (Id. ¶149.)

The deal closed on May 30, 2000. (Id. ¶44.) As part of the agreement, Grossinger agreed to purchase one-hundred-twenty Model Year 2000 vehicles for $2,543,618.14 and the Dealership's other assets for $2,450,779.88. (Id. ¶¶45-46.) Pursuant to Illinois law, $102,3000 of the purchase price was placed in escrow. (Id. ¶47.) The remainder of the purchase price, $4,892,098.02, was paid directly to Chrysler. (Id.) The Dealership also paid Chrysler proceeds from the sale of used motor vehicles. (Id. ¶48.) After all of these transactions, the Dealership still owed Chrysler $355,477.32. (Id.) The Dealership made payments to some affiliated parties, including Faul, Patrick Faul, and Faul Collision Center. (R. 62-1, Pl.'s Statement of Add'l Facts ¶150.) On May 31, 2000, the Dealership stopped its day-to-day business operations. (Id. ¶45.)

## ANALYSIS

Defendants Faul, the Dealership, and the Faul Group have moved for summary judgment on Counts I, IV, V and VI of the Amended Complaint. Defendants argue that Firstar has not created a genuine issue of material fact and that they are entitled to judgment as a matter of law on each count.

## I. Defendants Are Entitled To Summary Judgment On Piercing The Corporate Veil As A Matter Of Law

Under Illinois law, a corporation is a legal entity that is separate and distinct from its officers,

directors, shareholders, and affiliated corporations. *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985). In order to pierce a corporate veil under Illinois law, a plaintiff must show that: (1) there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist;" and (2) that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Id.* at 569-70. Defendants argue that Firstar cannot point to sufficient evidence showing that a genuine issue of material fact exists as to whether the Dealership's corporate veil should be pierced. The Court agrees. Summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisconsin Dept. of Corr.*, 175 F.3d 497, 503-04 (7th Cir. 1999). Firstar has simply not come forward with enough evidence that could convince a trier of fact that the Dealership's corporate veil should be pierced.

### A. Plaintiff Cannot Establish that Faul, the Faul Group, and the Dealership have a Unity of Interest

In order to find that defendants have a unity of interest, Illinois courts look at several factors: (1) whether the corporation has failed to maintain adequate corporate records or to comply with corporate formalities; (2) whether the other defendants have commingled the corporation's funds or assets; (3) whether the corporation was undercapitalized; and (4) whether the other defendants have treated the assets of the corporation as their own. *Van Dorn Co.*, 753 F.2d at 570. Firstar does not argue that the Dealership failed to maintain adequate corporate records or comply with corporate formalities. Firstar also does not maintain that Defendants have commingled the corporation's funds or assets. Firstar instead argues that the evidence is sufficient to show that Defendants treated the

Dealership's assets as their own and that the Dealership was undercapitalized.[3]

### 1. There is only limited evidence that supports Firstar's contention that Defendants treated the Dealership's assets as their own

Firstar argues that Defendants have treated the Dealership's assets as their own because: (1) Faul owned the property where the Dealership was located and received rent from the corporation; (2) the Dealership shared employees with other affiliated entities; (3) Faul used his office at the Dealership to manage other affiliated businesses; (4) Faul guaranteed the debts of the Dealership to Chrysler; (5) Faul, Patrick Faul, and Faul Collision Center received payments after the Grossinger sale closed; and (6) the Dealership paid for Faul's wife's cellular phone and a place for Faul to park his boat. This evidence, however, provides little support for Firstar's position.

First, the evidence that Faul owned the Dealership's property, standing alone, is irrelevant. Firstar does not maintain that Faul's purchase of the land amounted to a usurping of the Dealership's business opportunities or that the Dealership leased the land for more than its market value. There is no evidence that Faul put his personal interests above the Dealership's concerns. Therefore, the leasing of the property does not show that Defendants treated the Dealership's assets as their own.

---

[3] Firstar also maintains that the level of ownership and control exhibited by Faul leads to a conclusion that there was a unity of interest. Firstar points to the fact that Faul controlled all of the voting stock of the Dealership, was the sole officer and director of the Dealership, and was actively involved in the management of the Dealership. This evidence only shows that Faul may have had the opportunity to create a unity of interest with the Dealership. Moreover, Faul would not be doing his job as an officer and director if he failed to be actively involved in the management of the corporation. The Court finds that this evidence, which must exist in countless small corporations, is not suggestive of a unity of interest. *See Melko v. Dionisio*, 580 N.E.2d 586, 595 (Ill. App. Ct. 1991) ("[T]he mere allegation that [defendant] was a dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate existence."); *Hornsby v. Hornsby's Stores, Inc.*, 734 F.Supp. 302, 308 (N.D. Ill. 1990) ("The separate corporate entities of two corporations may not be disregarded merely because one owns the stock of another or because the two share common officers . . . .") (quoting *Sumner Realty Co. v. Willcott*, 499 N.E.2d 554, 557 (Ill. App. Ct. 1986)).

16

Second, a partial integration of workforce will not subject a company to veil piercing. The Seventh Circuit has sanctioned this type of conduct among affiliated companies. *See Papa v. Katy Indus.*, 166 F.3d 937, 943 (7th Cir. 1999) (integration of workforces and functions will not trigger loss of limited liability through piercing of corporate veil). Instead of being a way to defraud creditors, integration is a matter of efficiency. *Id.* The Defendants' partial integration does not show that Faul and the Faul Group treated the Dealership's assets as their own.

Third, the time Faul spent working on other affiliate matters while at the Dealership is not telling. He spent half of his time working on Dealership matters, and split the other half managing the other affiliated companies. He cannot be expected to have commuted to a different office each time he was going to work on a different affiliated business. It only made sense for him to have an office at the Dealership, which is a business he spent more time managing than any of his other interests. Moreover, this conduct is recognized by Illinois courts as a business reality. *See Hornsby v. Hornsby's Stores, Inc.*, 734 F.Supp. 302, 308 (N.D. Ill. 1990) (separate corporate entities will not be disregarded merely because they share office space); *Logal v. Inland Steel Indus., Inc.*, 568 N.E.2d 152, 156-57 (Ill. App. Ct. 1991) (Illinois courts have long held that a scenario where affiliates share office space is "common and exist[s] in most parent-subsidiary relationships. To hold otherwise would render virtually every subsidiary the alter ego of its parent.").

Fourth, Faul personally guaranteeing the Dealership debts to Chrysler does not show that Defendants used the Dealership's assets as their own. It is common practice for a shareholder of a small corporation to personally guarantee a loan. The personal guarantee is beneficial to the corporation because it allows it to receive a loan even where its assets may not otherwise entitle it to one. The transaction in no way offends the law of limited liability, because the shareholder only

17

subjects himself to increased risk and receives no increased benefit from the guarantee.

Fifth, the payments to Faul, Patrick Faul, and Faul Collision Center do not prove that Defendants treated the Dealership's assets as their own. After the sale of more than $4 million in assets, Faul received one check for $1,110.08, Patrick Faul received six for a total of $1,954.36, and Faul Collision Center received five for a total of $2,533.20. Firstar has not argued that these payments were inappropriate. The evidence before the Court shows that these payments were made after the Grossinger deal closed, but that they were not paid from the proceeds of the Grossinger sale. Those proceeds went directly to Chrysler or were deposited into an escrow. Further, the Dealership owed Faul rent payments at the time it gave him the check. Without evidence that these payments were improper, these facts do not support Firstar's argument. Firstar does not argue that these payments were outside of payments for debts owed to this affiliate or to the individuals.

Sixth, the Dealership's payment for Faul's wife's cellular phone and a place to park Faul's boat provides little support of Firstar's argument that Defendants used the Dealership's assets as their own. The Court cannot see piercing the Dealership's corporate veil simply because of these perks, especially where Faul used the boat on at least two occasions for business purposes. Although these facts might be some evidence of improper use of the Dealership's assets, it does not rise to a level that would permit a reasonable trier of fact to find a unity of interest.[4]

---

[4] Even if the facts were sufficient for the Court to find that Defendants treated the assets of the corporation as their own, Firstar has not raised a genuine issue of material fact with respect to the other three factors related to a finding of unity of interest. No one factor in the unity of interest analysis is dispositive. *Falcon Assocs., Inc. v. Cox*, 699 N.E.2d 203, 211 (Ill. App. Ct. 1998). This is especially true when the evidence of Defendants using the corporation's assets as their own is so minimal.

2.	**There is no evidence to support Firstar's contention that the Dealership was undercapitalized in a way so that there was a unity of interest among Defendants**

Undercapitalization will rarely if ever be the only factor that supports a decision to pierce the corporate veil. *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999). The Seventh Circuit has regarded the undercapitalization factor as simply "helpful in identifying a corporation as a pure shell." *Id.* Only where a corporation has "so little money that it could not and did not actually operate its nominal business on its own" will undercapitalization figure into the decision to pierce the corporate veil. *Id.*

Firstar alleges that the evidence favors a finding of undercapitalization because the Dealership paid no dividends, because it was losing money, and because Faul loaned millions of dollars to it in the 1990s. This evidence, however, is not sufficient to show that the Dealership was so undercapitalized that it was a pure shell. The infusions of cash by Faul show that he was not interested in draining the Dealership of its assets, but that he was willing to voluntarily infuse cash into the company, and increase his risk, to help the Dealership survive and meet its debts. The fact that it paid no dividends under these circumstances also shows that there is no reason to pierce the corporate veil. The Faul Group and Faul stood to gain by the Dealership paying dividends. It does not make sense to find that this evidence cuts against Defendants where paying dividends would have harmed the cash flow of a corporation that was experiencing that problem in the first place. Further, the evidence that the Dealership was losing money has no probative value in showing that the corporation was undercapitalized. Plaintiff only needs to look at the docket of our bankruptcy courts to see that large capitalization is irrelevant if a corporation's debts continually exceed its assets. Firstar has not met its burden of bringing forward evidence to show that the Dealership was

19

undercapitalized.

In sum, there is nothing in the record to suggest that the Dealership failed to maintain adequate corporate records, that it did not comply with corporate formalities, that the Defendants commingled the corporation's funds or assets, or that the Dealership was undercapitalized. There is only limited evidence that the Defendants treated the Dealership's assets as their own. As evidence of three of the four factors is non-existent, there is no genuine issue of material fact that would allow a reasonable fact finder to conclude that Defendants had a unity of interest.

**B.     Firstar Cannot Show that Adherence to the Fiction of Separate Corporate Existence Would Sanction a Fraud or Promote Injustice**

Illinois courts will not pierce the corporate veil simply to allow a plaintiff to collect on its outstanding debt. *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522 (7th Cir. 1991). Instead, Illinois courts will only find that piercing is proper where failure to do so would: (1) unfairly enrich one of the parties; (2) allow a parent corporation to escape responsibility where it had created a subsidiary's liabilities and was the cause of the subsidiary's inability to meet those liabilities; (3) allow former partners to ignore obligations; or (4) uphold a corporate arrangement to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation. *Hystro Prods. v. MNP Corp.*, 18 F.3d 1384, 1390 (7th Cir. 1994).

Simply put, none of these wrongs exist. Firstar does not argue that any Defendant has been unjustly enriched.[5] Nor does it maintain that the Faul Group created the Dealership's liabilities and was the cause of its inability to meet those obligations. Further, there are no former partners that

---

[5] Unjust enrichment is "the receipt of money or its equivalent under circumstances that, in equity and good conscience, suggest that it ought not to be retained because it belongs to someone else." *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir. 1993).

would be allowed to ignore obligations absent a piercing of the corporate veil. Finally, there is no evidence that there is a corporate arrangement to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation in the Dealership.

Having failed to establish a unity of interest or that failure to pierce the corporate veil will sanction fraud or injustice, Firstar has not created a genuine issue of material fact with respect to piercing the Dealership's corporate veil. Accordingly, Defendants are entitled to judgment as a matter of law on Count I.

## II.     Defendants' Motion For Summary Judgment On Count IV Is Denied With Respect To The Dealership And Granted With Respect To Faul

Firstar alleges in Count IV that Defendants committed fraud by writing and depositing improper Firstar drafts. Defendants move for summary judgments on several grounds. First, they argue that they are entitled to summary judgment on their affirmative defense that Firstar failed to state a claim upon which relief can be granted. Second, they maintain that Firstar cannot establish the existence of the elements of fraud under Illinois law against the Dealership. Third, they contend that Faul cannot be held personally liable for fraud.

### A.     Defendants are not Entitled to Summary Judgment on their Affirmative Defense that Firstar has Failed to State a Claim upon which Relief can be Granted in Count IV

Defendants maintain that they are entitled to summary judgment on their affirmative defense that Firstar failed to state a claim for fraud upon which relief can be granted. Defendants maintain that Firstar's amended complaint with the particularity required by Federal Rule of Civil Procedure 9(b) because Firstar failed to allege which drafts are duplicates and which are excessive, as well as the exact fraudulent nature of the representations. Defendants did not raise this issue by filing a

motion to dismiss under Rule 12(b)(6), but seek summary judgment under Rule 56. Even if this were the proper stage of the proceedings to raise this issue, the Court will not grant summary judgment because none of the policy reasons behind Rule 9(b) would be served. Rule 9(b) is intended to protect a defendant's reputation from harm, minimize strike suits and fishing expeditions, and provide notice of the claim to the adverse party. *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994). At this point, any harm to Defendants' reputation based on the allegations occurred years ago. The parties have already completed the extensive discovery process and Defendants are well aware of the basis of Firstar's claims. Most compelling, the evidence showing which drafts are duplicates and which are excessive is undisputed, and indeed was initially submitted to this Court by Defendants. The fraudulent nature of these representations is patently obvious. The Court sees no reason to determine whether that fraudulent conduct was stated with sufficient particularity years ago when the evidence itself is undisputed and particular. *Cf. A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 638 (7th Cir. 2001) (declining to analyze whether fraud was pleaded with sufficiency because both sides squarely addressed fraud theory at summary judgment stage); *Golden v. Terre Linda Corp.*, No. 95 C 0657, 1996 WL 426760, at *3 n.2 (N.D. Ill. July 26, 1996) (defendant's adequate notice of fraud claim was demonstrated by his ability to file detailed motion for summary judgment).

### B.    The Dealership is not Entitled to Summary Judgment on Count IV

In Illinois, common law fraud can be established where there is: (1) a false representation of a material fact; (2) by a party who knows or believes it to be false; (3) with the intent to induce a plaintiff to act; (4) an action by a plaintiff in reliance on the statement; and (5) an injury to the plaintiff as a consequence of that reliance. *In re Witt*, 583 N.E.2d 526 (Ill. 1991). Defendants argue

that Firstar cannot establish fraud because two elements are lacking. First, Defendants claim that the Dealership did not have the intent to induce Firstar to act. Next, Defendants maintain that Firstar did not justifiably rely on its statements. Whether these elements exist is an issue of fact. *See Washington Courte Condo. Association-Four v. Washington-Golf Corp.*, 643 N.E.2d 199, 216 (Ill. App. Ct. 1994).

### 1. Whether the Dealership acted with an intent to induce Firstar to act is a dispute of material fact

To satisfy the third prong of a fraud claim under Illinois law, Firstar must show that the Dealership wrote the drafts for the purpose of inducing the plaintiff to act. *Glazewski v. Coronet Ins. Co.*, 483 N.E.2d 1263, 1266 (Ill. 1985). Illinois courts "seldom expect to prove [fraudulent intent] by the admissions of a party and rarely to find direct and positive evidence of the fact." *Chicago Title & Trust Co. v. First Arlington Nat'l Bank*, 454 N.E.2d 723, 730 (Ill. App. Ct. 1983). Because a party will often have no direct evidence of fraudulent intent, circumstantial evidence may give rise to an inference of it. *Cincinnati Ins. Co. v. Guccione*, 719 N.E.2d 787, 792 (Ill. App. Ct. 1999); *see also Majewski v. Gallina*, 160 N.E.2d 783, 788 (Ill. 1959) (proof of elements may be made through circumstantial evidence and reasonable inferences drawn therefrom).

Here, the circumstances surrounding the writing and depositing of improper drafts could lead a reasonable trier of fact to conclude that they were submitted with fraudulent intent. Many of the repeated drafts related to sales contracts, where redrafting was seldom done. On a few occasions, the Dealership wrote and deposited the drafts after Firstar had stated its refusal to purchase the underlying contract. There were also several occasions where the Dealership wrote and deposited duplicative Firstar drafts for the same transaction.

23

That the transactions were potentially fraudulent cannot be looked at in a vacuum. During these times, the Dealership was experiencing a cash flow problem. A reasonable trier of fact could find that the improper drafts were part of a *Fargo*-esque scheme to obtain more funds during a period when it was experiencing cash flow troubles.

The Navarro transaction led to the most egregious conduct by the Dealership and could itself lead a reasonable fact-finder to the conclusion that the Dealership operated with a fraudulent motive. In that transaction, the Dealership prepared six drafts for the full purchase price from four different entities. Only one entity had agreed to purchase the contract. Two entities (including Firstar) had declined to do so. There is no evidence that the Dealership even had approached another entity about the contract. But that did not stop the Dealership from writing and depositing draft notes from each. Even the Dealership's conduct towards Mercantile Bank, which agreed to purchase the contract, evidences a potential fraudulent scheme because the Dealership prepared and deposited three of its drafts that were duplicative.

The Dealership claims that it did not act with fraudulent intent because the multiple drafts and erroneous submissions were clerical errors. In support of this statement, the Dealership states that "[s]ometimes" legitimate issues "occurred outside the drafting process that might require redrafting." (R. 71-1, Defs.' Reply Mem. at 9.) The Dealership also maintains that there were "possible explanations as to why redrafts occurred." (*Id.*) The Dealership has no direct evidence to back these assertions up, but merely speculates about what might have happened. Speculation and conjecture are no substitute for undisputed facts at the summary judgment stage, however, where it is the Court's task to determine whether an issue of fact exists for a trial on the merits. *See Tyler v. Runyon*, 70 F.3d 458, 469 (7th Cir. 1995). The evidence itself shows that there is an issue of fact as

to whether the Dealership wrote the drafts with a fraudulent intent to induce Firstar to pay the notes. *See Cincinnati Ins. Co.*, 719 N.E.2d at 792 ("summary judgment is particularly inappropriate where . . . the motive, intent, or subjective feelings of the parties are at issue.").

In *Chicago Title*, the plaintiff inadvertently and unknowingly paid $42,000 to the defendant. The defendant knew that the payment was inadvertent. 454 N.E.2d at 727. It later sent an invoice that did not reflect the $42,000 submission. *Id.* The defendant claimed that the mistake was innocent and that there was no intent to deceive. *Id.* at 729-30. The court upheld the trial court's finding that fraudulent intent had been proven from circumstantial evidence. *Id.* at 730. The facts here are analogous to *Chicago Title*. Providing Firstar with all reasonable inferences, the Dealership knew that the drafts were false, yet it submitted them with intending for Firstar to honor the drafts. Although the impropriety of these drafts may be explained away as clerical errors, a reasonable fact finder could find that the Dealership acted with fraudulent intent.

## 2.    Whether the Dealership justifiably relied upon the Dealership's statements is a genuine dispute of material fact

In order to prove fraud, the plaintiff must show that it justifiably relied on the statement. *Glazewski*, 483 N.E.2d at 1266. Whether a plaintiff's reliance was reasonable under the circumstances is generally a question of fact. *Miller v. William Chevrolet/Geo, Inc.*, 762 N.E.2d 1, 10 (Ill. App. Ct. 2001). The Dealership claims that Firstar could not have relied upon its representations in the drafts as a matter of law because Firstar's should have simply marked the draft "refer to maker" and returned it to the bank for credit.

Illinois recognizes a distinction made in comment b of Section 545A of the Restatement (Second) of Torts:

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case rather than the application of a community standard in all cases. Negligent reliance and action sometimes will not be justifiable, and recovery will be barred; but this is not always the case.

*See Chicago Title & Trust Co.*, 454 N.E.2d at 729.

A plaintiff will have only neglected to meet this standard "where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id.* (quoting Prosser on Torts (4th ed. 1971) § 108, at 718). *See also Citizens Savings & Loan Ass'n v. Fischer*, 214 N.E.2d 612, 616 (Ill. App. Ct. 1966) ("In the absence of circumstances putting a reasonable person on inquiry, a person is justified in relying on a misrepresentation of a material fact without making further inquiry."). Just as important, a defendant that has knowingly made false representations and knows the other to be misled "cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care." *Chicago Title & Trust Co.*, 454 N.E.2d at 728.

Firstar has shown that there is a genuine issue of material fact as to whether its reliance was justified. The Dealership had blank Firstar drafts, which it wrote and deposited if Firstar approved of the purchase of the contract. Firstar was then in a passive position of having to wait until the Dealership delivered the motor vehicle to its customer and forwarded the paper work to Firstar. It did not create a file on the transaction until after it received this paperwork. It appears that Firstar

could have been more proactive in making sure that the deposits were legitimate, but that is not the standard of justifiable reliance. Providing Firstar with all reasonable inferences, it can meet all of the elements of fraud under Illinois law. Accordingly, the Court declines to award the Dealership summary judgment on Count IV.

### C.    Faul is Entitled to Summary Judgment on Count IV

Defendants argue that Faul cannot be liable for fraud relating to the improper drafts because there is no evidence showing that he participated in the drafting process. Firstar maintains that Faul can be held liable for fraud because his role as an officer and director of the Dealership supports an inference that he had knowledge of the false and material representations.

As a general rule, a corporate officer is not liable for the corporation's torts simply by virtue of his office. *Washington Courte*, 643 N.E.2d at 217. Firstar is incorrect in asserting that a director or officer can be liable for fraud in Illinois simply based on knowledge. Under Illinois law, an officer or director is only liable for his corporation's fraud if the officer or director "with knowledge, or recklessly without it, ***participates or assists in the fraud.***" *People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 179 (Ill. 1992) (quoting *Murphy v. Walters*, 410 N.E.2d 107 (Ill. App. Ct. 1980) (emphasis added). In other words, Illinois requires "some degree of activity and active involvement" by the officer or director. *Itofca, Inc. v. Hellhake*, 8 F.3d 1202, 1205 (7th Cir. 1993). Therefore, even if the Court were to accept Firstar's contention that Faul's duties support an inference that he had knowledge of the improper drafts, Firstar would still have to come forward with some action on Faul's part that contributed to the fraud.

Firstar does not point to any evidence of Faul's participation in the fraud. The undisputed facts show that Faul did not write the improper drafts. There is no evidence that Faul directed

anyone to resort to improper measures to improve the Dealership's cash flow situation. Firstar had the burden to come forward with some evidence that would create a genuine issue of material fact as to whether Faul participated in the fraud. Because it has not met this burden, Faul is entitled to judgment as a matter of law.

## III.    Defendants' Motion For Summary Judgment On Count V Is Granted

In Count V, Firstar alleges that Faul and the Dealership transferred the assets of the Dealership to third parties in violation of the Illinois Fraudulent Transfer Act. At issue is the sale of the Dealership's assets to Grossinger. (R. 64-1, Resp. to Defs.' Mot. for Summ. J. at 31.) Defendants move for summary judgment on Count V on the grounds that Firstar cannot show that the transfer was fraudulent.

The law of fraudulent conveyance is intended to protect creditors from "last-minute diminutions of the pool of assets in which they have interests." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988). Illinois recognizes two types of fraudulent conveyance: (1) fraudulent in law and (2) fraudulent in fact. To be fraudulent in law, there must be a transfer made for no or inadequate consideration. *Gendron v. Chicago & N. W. Transp. Co.*, 564 N.E.2d 1207, 1215 (Ill. 1990). A claim that a transfer was fraudulent in fact can be supported in Illinois even if it was made for consideration. *Scholes v. African Enter., Inc.*, 854 F.Supp. 1315, 1325 n.2 (N.D. Ill. 1994). Firstar has only alleged that the Dealership's sale was fraudulent in fact.

To prove that a conveyance was fraudulent in fact, a creditor must show that the debtor entered into the transaction with a specific intent to defraud creditors. *In re Cash Currency Exch., Inc.*, 93 B.R. 618 (N.D. Ill. 1988). The undisputed facts do not show any specific intent to defraud, so the Court must look to the eleven "badges of fraud" listed in the Illinois Uniform Transfer Act

28

to determine whether Defendants had that specific intent. *See* 740 ILCS 160/5(b); *Lindholm v. Holtz,* 581 N.E.2d 860, 863 (Ill. App. Ct. 1991). According to this statute, courts should look to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 740 ILCS 160/5(b)

There is no serious dispute as to which of these factors exist and which are lacking here. Providing Plaintiff with all reasonable inferences, Firstar can show that the third, fourth, fifth and ninth badges of fraud exist because: (1) the Dealership did not disclose the sale to Firstar; (2) some evidence suggests that the Dealership had been sued or threatened with suit before the sale; (3) the Dealership sold all of its assets; and (4) the Dealership became insolvent shortly after the sale of its assets.

The remaining badges of fraud do not exist. The undisputed facts show that the conveyance was not to an insider; Defendants did not retain possession or control of the Dealership's assets after the transfer; and the transfer did not occur shortly before of after the Dealership incurred a substantial debt, but accrued over a several month period of time. Further, there is no evidence in

the record to suggest that a Defendant absconded after the transfer; that a Defendant removed or concealed assets; that the amount paid by Grossinger was any less than the value of the Dealership's assets; or that the Dealership transferred its essential assets to a lienor who then transferred the assets a Dealership insider.

The Court finds that the four existing badges of fraud are insufficient to prove that Defendants acted with the specific intent of defrauding its creditors. Indeed, the undisputed facts show that the transfer was made with the opposite intent. The Dealership used the sale of assets to pay part of what it owed to Chrysler, its secured creditor.[6] Defendants had every incentive to find the best purchase price for its assets, because Faul agreed to be personally liable for the Dealership's debts to Chrysler. Even after the sale of its assets, the Dealership owed Chrysler $355,477.32. It appears that Firstar sold its assets in order to best pay its creditors, not to delay payment. The undisputed facts show that Firstar did not have the specific intent to defraud its creditors. Accordingly, Defendants are entitled to judgment as a matter of law on Firstar's fraudulent conveyance claim in Count V.

## IV. Defendants' Motion For Summary Judgment On Count VI Is Granted With Respect To Faul

Firstar alleges in Count VI that Faul and the Dealership converted Firstar's assets when the Dealership wrote and deposited improper drafts. On February 24, 2003, the Court entered judgment in Firstar's favor against the Dealership. *See Firstar Bank, N.A.*, 2003 WL 548365 at*1. Faul maintains that he cannot be liable for the Dealership's conversion. The issue is identical to the one the Court addressed with respect to fraud. Because there is no evidence that Faul participated in the

---

[6] Firstar does not dispute that Chrysler was first in line for payment.

conversion, he is entitled to judgment as a matter of law on Count VI.

## CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part. Defendants are entitled to judgment as a matter of law on Count I and Count V. Faul is entitled to judgment as a matter of law on Counts IV and VI. Because a genuine issue of material facts exist as to whether the Dealership committed fraud, the Court denies Defendants' summary judgment motion in favor of the Dealership on Count IV.

DATED: March 11, 2003

ENTERED

AMY J. ST EVE
United States District Judge